722 So.2d 1283 (1998)
JLG CONCRETE PRODUCTS COMPANY, INC., Appellant,
v.
CITY OF GRENADA, Mississippi, Appellee.
No. 96-CA-00925 COA
Court of Appeals of Mississippi.
October 27, 1998.
*1284 Stephan Land McDavid, Oxford, Attorney for Appellant.
Marian S. Alexander, Greenville, Attorney for Appellee.
Before THOMAS, P.J., KING, AND SOUTHWICK, JJ.
SOUTHWICK, J., for the Court:
¶ 1. The City of Grenada sought a declaratory judgment that JLG Concrete had no current lease entitling it to occupy 40 acres of City property. After a trial, the chancellor declared that no renewal of a 1957 lease granted by the City had ever been properly authorized and that JLG had no rights to the tract. JLG appeals asserting that a valid renewal had been obtained from the City in 1982. The City cross-appeals asserting that the chancellor improperly denied its timely amendment to add a claim for damages to the property. We find no error and affirm.

STATEMENT OF FACTS
¶ 2. On February 23, 1957, the City leased a 30-acre tract to Boyd Construction Company. The lease had a 25-year term. It also granted Boyd "the first right and option to renew said lease for two consecutive periods of twenty-five (25) years each upon the completion *1285 of the primary term, each additional period to be negotiated" by the parties. At least 30 days notice was to be given of the lessee's intent to renew. The property was part of a World War II air base in Grenada that in 1948 was granted to the City and became its airport. Boyd by the 1957 lease was to maintain a water well at the site, from which Boyd had the right to unlimited water, and to maintain the access road that led to its tract as well as to the airport itself. An addendum to the lease five weeks later stated that Boyd was to use the property for the manufacture of concrete products.
¶ 3. In 1974 additional tracts were added to those originally leased, making a total of 36 acres. Each lease or addenda was approved by contemporaneous action of the Grenada City Council. The Council's minutes reflect each approval, though the 1974 addenda itself was not put in the minutes. The rent beginning in 1957 was $400 per year. After 1974 the annual rent was $900. For reasons and on a date not revealed by the record, the rent became $1500 by 1979.
¶ 4. In 1979 Boyd assigned its interest under the lease to Grenada Concrete Products, a company that subsequently changed its name to JLG Concrete Products Company, Inc.. "JLG" is John L. Grantham, the son-in-law of Boyd's owner. The assignee continued to operate a concrete business at the site until 1983. In 1985 JLG assigned to Fluker Enterprises a portion of its leasehold interest comprising 25 acres. JLG retained a deed of trust. Fluker sought bankruptcy protection in 1988 and conveyed the property back to JLG by a deed in lieu of foreclosure.
¶ 5. A pre-stress manufacture facility has been idle since 1989. A separate ready-mix plant closed in 1991, was sold and then moved off the property by the purchaser. No rent was paid on the lease from 1983 until 1989. The City Clerk contacted JLG in 1989 and demanded annual back-rent at $1500 per year. JLG questioned the amount, as the source of that $1500 figure was unknown. The rent for 1984 through 1989 was ultimately paid. Rent for the years of this litigation has been rejected by the City. The parties agree that the property has not been used for a substantial number of years.
¶ 6. The City sought to introduce evidence regarding the substantial damage to the property over the years, including a "mountain" of concrete from washing out ready-mix trucks, buried concrete and rebar rods, and dilapidated structures. Whether the property is worthless, is worse than worthless because of clean-up costs, or is extraordinarily valuable is neither directly apparent from the record nor relevant to our decision. However, two parties have been in litigation over the property since 1993, which at least creates an inference about value.
¶ 7. What occurred in the early 1980's regarding a possible renewal of the 25-year lease is the central factual and legal focus of this appeal. Apparently no concern about the need for or existence of a renewal lease animated the City until the absence of rent payments was noticed by the City Clerk in 1989. In 1979 JLG upon being assigned the leasehold by Boyd attempted to get an early renewal from the City. Audio tapes of a council meeting in 1979 were introduced into the record that revealed a discussion of the issue, concern that the rent was too low, and ultimately no action being taken. In 1980 JLG contacted the Airport Commission for a lease renewal, but was referred to the City as the proper leasing authority. A review of the minutes of the city council following the one previously mentioned 1979 meeting through 1989 revealed no further discussion of a renewal. No renewal document was ever discovered in any party's files or on the official records. Thus 1982the end of the 25-year lease periodcame and went without a formal renewal.
¶ 8. Whether there might have been a renewal granted in another way was the factual question below, and whether there could validly be another form of renewal was the legal issue. JLG argues that no new lease was required in 1982 and the 1957 lease could be renewed by a proper official's agreement to extend the lease for another 25-years. JLG argues that they sent to the City's thenmanager a notice of renewal in early 1982, and the manager responded in writing that the City accepted the renewal. Neither document could be produced in evidence. The City points out that its manager who allegedly *1286 was the recipient of the notice and the sender of the acceptance, was terminated by the City in June 1982 and went to work for JLG.
¶ 9. On March 22, 1993 the City brought its complaint for a declaratory judgement. JLG counterclaimed for various relief. The City moved on September 20, 1995 (five months before trial) to amend to add a claim for damages to the property. The motion was denied. The chancellor after a trial found that the 1957 lease was never renewed and had expired. Both parties appeal.

DISCUSSION

1. Preliminary Matters
¶ 10. The City argues that the original 1957 lease was void from its inception. This argument arises from one city council's grant of a 25-year lease with the right to enter renewals, thereby binding for 75 years all future councils. There is also an argument that the City had only the authority to sell this property and not to lease it. We do not consider these claims because they become academic once we hold that the lease, regardless of whether it was ever alive, is now dead.
¶ 11. The City also argues that the rent paid on the property was so low as to constitute an unconstitutional donation of public property for private use. This too becomes a moot issue.

2. Need for formal renewal
¶ 12. JLG looks to the language of the 1957 lease and says that the chancellor erred in requiring proof of city council approval of a renewal in 1982. We repeat that the lessee received
the first right and option to renew said lease for two consecutive periods of twenty-five (25) years each upon the completion of the primary term, each additional period to be negotiated upon [the lessee's] giving at least thirty (30) days written notice to [the City] of its intention so to renew said original lease.
In order to receive the benefit of this provision, JLG argues that all was necessary was to send notice to the City and no formal action by the City was then necessary.
¶ 13. An automatic renewal provision would be possible to write into a lease, but we do not find that this is one. Had the lease stated that the lessee had the right to renew on the same terms and conditions as before, including at the same rent, then we might agree with JLG. Instead, the only matters necessarily settled by the 1957 lease language was that the lessee had the first right to a renewal, and that it would be for another 25 years. Terms such as rent and additional obligations or limitations regarding use of the property had to be negotiated. Under the original lease JLG could use the water well on the property but had to maintain it for use by the City; a road was to be kept serviceable as well. Provisions similar to those or entirely different could have been insisted upon by the City. The key word in the 1957 lease was that a lease had to be "negotiated."
¶ 14. The evidence revealed that some on the City council in 1979 did not want to renew the lease unless substantial alteration in the terms occurred. It is undisputed that no council vote was ever taken that renewed this lease. At most JLG had an agreement to negotiate, but no negotiation ever occurred with the City that led to action by the council.
¶ 15. The Mississippi authorities explaining the legal principles in this area are not plentiful. If a lessee is given the option to renew on the same terms as the original lease, then no renewal document is needed. In one precedent, the lessee received "the option of renewing this lease for an additional five years at the same price, and upon the same terms and conditions as herein stipulated." Economy Stores, Inc. v. Moran, 178 Miss. 62, 66, 172 So. 865 (1937). The court held that the original lease should be interpreted as "a demise of the land for the term, including the optional term of five years," and that the lessee's staying in possession and continuing to pay rent was adequate notice of renewal. Id. at 68-69, 172 So. 865. See also Howard v. Tomicich, 81 Miss. 703, 33 So. 493, 494 (1903).
*1287 ¶ 16. JLG argues that the chancellor relied too much on the negative implication of this case, namely, that if the renewal option must be negotiated, then a new lease must be entered. We agree with the chancellor, however, and note the silence in the record on all the following:
1) no new lease can be found;
2) no proof on the minutes of the city council that a renewal, on the same terms or new ones, was ever discussed much less approved; and
3) the alleged proof of notice and acceptance, arising from a purported exchange of letters in 1982, cannot be produced.
¶ 17. The only reasonable interpretation of Economy Stores is that the court was not going to permit form to rule over substance. If everything is settled about a renewal term except whether the option to accept it will be exercised, then there is nothing to establish in a new lease document. The fact that the option was exercised can be proven in a variety of ways. The need for a new lease document here is self-evident. A court may apply rules of interpretation to establish the meaning of a few ambiguous phrases in a contract, but we have nothing to interpret since there is no contract to review. We have the old lease that granted an option to renew, but the terms and conditions of the new lease were totally up to the agreement of the parties other than it would last 25 years.
¶ 18. The City properly argues that governments act through official records. Such statements as the "minutes are the only evidence of the official actions of the municipality" abound in the case law. City of Moss Point v. Miller, 608 So.2d 1332, 1337 (Miss. 1992). There is no evidence in the record that any official for the City such as the former city manager had the authority to negotiate, agree to terms, and enter an agreement to lease real property. No special provisions of Grenada's charter that might affect the city manager's authority were provided us.
¶ 19. Anyone contracting or purchasing from the City must be aware of the limitations that apply. Martin v. Newell, 198 Miss. 809, 815, 23 So.2d 796 (1945). In Martin, the court said that a party contracting with a county is bound by the requirement that a contract "requires an entry on the minutes of the board." Id. If the minutes do not reflect what is required, the private party can insist that a correction be entered. Failing that, other steps might be taken. There is no hint that JLG engaged in any efforts to assure the validity of a renewal if a renewal in fact was ever entered. Though the parties do not refer us to specific statutes addressing the city council-city manger form of government, we find that since 1952 a city manager could only negotiate contracts and make purchases "subject to the approval of the council." Miss.Code Ann. § 21-9-29 (Rev.1990). We find no authority for a city manager to enter leases or to negotiate regarding them, though the council perhaps could delegate specific authority. If so, we have no evidence of a delegation.
¶ 20. The city manager does not himself have authority to lease, but all municipalities have the general authority to buy, sell or lease real property. Miss.Code Ann. § 21-17-1 (Rev.1990). There simply is nothing in the record to remove or limit the general requirement that actions by a municipality must be authorized by proper entries on the minutes of the governing body. Even if the city manager received a notice from JLG and wrote back his approval, this does not constitute action authorized under any statute or charter provision provided to us. No other action regarding this lease had been conducted in such an informal mannernot the original 1957 lease or either of the two addenda to it. It would be quite an anomaly that adding six extra acres to the lease in 1974 had more formality to it than did the supposed renewal for 25 years of the entire lease in 1982.
¶ 21. We agree that the chancellor properly found that the lease had not been renewed.

3. Implied contract and equitable estoppel
¶ 22. JLG argues that equitable estoppel, implied contract, or other similar doctrines *1288 apply here. The elements of estoppel are familiar:
Conduct and acts, language or silence, amounting to a representation or concealment of material facts, with knowledge of such facts, with the intent that the representation or silence, or concealment be relied upon, with the other party's ignorance of the true facts, and reliance to his damage upon the representation or silence.
Crowe v. Fotiades, 224 Miss. 422, 80 So.2d 478, 486 (1955), quoted in Brennan v. Brennan, 605 So.2d 749, 752 (Miss.1992).
¶ 23. The parties dispute whether estoppel applies to municipalities. What cases are cited to us regarding estoppel indicate relief has been granted if a technical defect exists in municipal action, but significant loss to a private party will occur if the action is completely voided. The principal authority cited concerns the purchase of a fire truck through public bidding, but the contract of purchase was never fully set out in the minutes. American-Lafrance, Inc. v. City of Philadelphia, 183 Miss. 207, 217-18, 184 So. 620 (1938). The supreme court held that some measure of compensation was due the successful bidder, even though the contract was void, when the following occurred:
where there has been an entire fairness in the dealings between the seller and the municipal officers and agents, and the transaction has throughout been conducted in the open, in such manner that of the public within the municipality might at any time see, or upon inquiry might know, in truth, all that is or has been going on about it; when all those substantial steps have actually been taken, which are designed in their requirement to avert, so far as reasonably practicable, all opportunities for favoritism ..., and when the only defects in the contract are in omissions in a technical aspect, as for instance, to make a perfect record of what has been done or is to be done ...
Id. at 220-221, 184 So. 620.
¶ 24. Almost none of the elements set out in American-Lafrance apply here. The missing renewal lease, without any evidence of council action, is not just a technical failure fully to reflect precisely the terms of a contract in the minutes. Here there is almost no evidence that there were negotiations, or when the action occurred, or any of the terms of the agreement, or compliance with any terms by the lessee until the city clerk noticed that no rent had been received in years. What was missing in American-Lafrance was a record on the minutes of the city of everything that had to be determined. Here it appears that the city council was not even involved in the determination.
¶ 25. Actions must be taken by the party asserting estoppel that were in justifiable reliance on the actions of the party to be estopped. The actions of making expenditures on the property before 1982 were without a guarantee that negotiations for a renewal would lead to an agreement. No estoppel arises from that. Had the City unreasonably refused to negotiate, there might be an issue arising from that. Here, there is almost no evidence that JLG attempted to negotiate. An early renewal was sought in 1979 but the City and JLG appeared to have different expectations and no agreement was reached. Insofar as the evidence shows, that was the last time JLG raised the issue with the council. In 1980 JLG tried to bypass the City and go to the airport commission, but that was unsuccessful.
¶ 26. There were also some improvements made in 1982, after the alleged renewal. JLG's owner testified that his company resurfaced the access road at a cost of $34,000 in about 1982, which provided access to its facilities and to the airport. He also testified that JLG's shop was renovated at about the same time. No improvements to the road or to the lessee's facility have recently occurred, as the property has not been used for years. JLG has had the benefit of those improvements since 1982 and lasting well past the time that the property stopped being used in 1991. No evidence was introduced as to the present value, if any, of these improvements.
¶ 27. There was no manifest error in the chancellor's failing to find estoppel arising from improvements that at the time of trial were fourteen years old. There is also the more serious defect of whether the City had done anything that could cause estoppel to *1289 arise. The chancellor never found that a "notice of renewal" was sent to the city manager in early 1982 and an acceptance returned. It appears he also never specifically found that these events did not occur. Even had notice been sent and acceptance returned, no estoppel to the City would arise from what, under Martin v. Newell, must be considered a knowing failure to negotiate with the proper entitythe City and its council. In the face of clear legal authority that the city manager had no authority to renew on his own and in the absence of any agreement as to new terms, we find that no justifiable reliance on such action was possible.
¶ 28. No equitable grounds exists to override the absence of city council approval of a lease renewal. JLG was a tenant at will, obligated to pay rent payments until ousted. As a tenant at will JLG had the benefit of any improvements that it made until the City successfully blocked further use of the property, just as it had a continuing obligation to pay rent. Nothing JLG did during the extended, unapproved term of the lease estops the City from ousting them or requires the City to pay compensation.

4. Cross appeal
¶ 29. The City argues that during discovery it found that substantial damage had occurred to the leasehold estate by JLG's operations. The chancellor had established a schedule for discovery and for the filing of motions. Two-and-a-half years after the declaratory judgment action was filed by the City, and five days before the end of discovery, the City sought an amendment to add a claim for damages. Both parties agree that the amendment would have required additional discovery, perhaps even returning to some of the same deponents and document files that had already been produced when the issues were narrower. The chancellor did not rule on the motion until trial despite several requests by the City for an earlier ruling. Finally, the motion for an amendment was denied.
¶ 30. Our civil rules provide for liberal amendment to pleadings. Leave of court is required after the initial stages of litigation, but "leave shall be freely given when justice so requires." M.R.C.P. 15(a). An amendment should be denied only when it would "cause actual prejudice to the opposite party." Id., cmt. The chancellor certainly would have been entitled to grant leave for the amendment. It is indeed a close question whether his discretion was not abused by refusing this amendment.
¶ 31. Considering how long the case had been proceeding, the deadlines for discovery that had already been imposed in order to move the docket along, the additional discovery that would have been required, there were certainly considerations regarding the "interests of justice" that weighed on both sides of the scale. What we find to tip the balance towards the ruling is that the City informed the chancellor that it was only at that late date that it became aware of the potential damage to the property. This was City-owned property, easily accessible at all times, adjacent to the public airport, in which for years a "mountain" of cement had loomed for all to see and the deteriorating buildings appear, verbally appear at least, to have been an eyesore. Late discovery of such facts just is not plausible.
¶ 32. We find no abuse of discretion in denying leave to amend.
¶ 33. THE JUDGMENT OF THE CHANCERY COURT OF GRENADA COUNTY IS AFFIRMED ON DIRECT AND CROSS-APPEAL. COSTS ARE ASSESSED EQUALLY TO THE PARTIES.
BRIDGES, C.J., McMILLIN AND THOMAS, P.JJ., COLEMAN, DIAZ, HERRING, HINKEBEIN, KING, AND PAYNE, JJ., CONCUR.