972 So.2d 11 (2008)
Julia W. LANGE, David L. Lange, James S. Whitaker, Jr. and James S. Whitaker, Sr., by and through the Executrix of the Estate, Joyce Whitaker, Appellants
v.
CITY OF BATESVILLE, Appellee.
No. 2007-CA-00533-COA.
Court of Appeals of Mississippi.
January 8, 2008.
*13 Edward P. Connell, Charles M. Merkel, Clarksdale, attorneys for appellants.
Benjamin E. Griffith, Cleveland, Michael Stephen Carr, Brookhaven, attorneys for appellee.
Before LEE, P.J., IRVING and ROBERTS, JJ.
ROBERTS, J., for the Court.

SUMMARY OF THE CASE
¶ 1. The appellants (the Whitakers) and Panola County entered into an agreement under which the appellants agreed to give the county 70,000 cubic yards of dirt to be used for future construction in exchange for a "public road" the county would build on the appellants' land. After the county realized it was financially unable to complete the project, the City of Batesville *14 (the City) agreed to take over the project and the agreement with the appellants. Confusion over the specifics of the road arose, and the Whitakers began their legal battle with a bill of exceptions that ultimately led to their current complaint for breach of contract filed with the Circuit Court of Panola County. The City subsequently filed a motion for summary judgment, which the trial court granted. This appeal followed.

FACTS AND PROCEDURAL HISTORY
¶ 2. With the current appeal, the parties find themselves before this Court for the second time. See Lange v. City of Batesville, 832 So.2d 1236 (Miss.Ct.App.2002) (Lange I). As a majority of the underlying facts relevant to the current review were previously stated in sufficient detail in Lange I we now restate those facts verbatim.
Panola County developed plans for construction of an arena on property east of Interstate 55 and south of Highway 6 East in Batesville, Mississippi. The County's architect, the Warrior Group, LTD, prepared drawings for what was called the "Arena Project." Those drawings included both the layout of the buildings to be constructed as well as parking lots and a five-lane road leading from the project and intersecting with Highway 6. Also included was a topographical map detailing the extent to which certain portions of the property would be leveled.
On July 31, 1996, Panola County entered into an agreement for a temporary easement [the Agreement] with [the Whitakers]. The Whitakers granted to Panola County "a temporary right of entry and temporary easement" to a certain parcel of property which was to the east of the Arena Project property. The Whitaker property and the Arena Project property shared a common boundary. The temporary easement allowed Panola County to enter the Whitaker property for the purpose of removing 70,000 cubic yards of dirt. The project ultimately required 100,000 cubic yards of dirt. Once the removal was complete, the easement and right of entry would terminate.
Several conditions were placed upon the grant of the easement. The condition which is the subject of this litigation reads as follows:
The Grantee [County] has plans to build an expo center and is about to embark upon Phase I thereof. If the Grantee commences Phase 2 of such project within two (2) years of the date hereof, then the Grantors [the Whitakers] agree to dedicate to the county such part of the above described 5.47 acres as may be needed for a public road. If Phase 2 is not commenced within two (2) years but the County has evidenced good faith to commence same within a reasonable period of time, then the Grantors agree to extend the aforesaid two (2) year period for a reasonable time.
The County also agreed to transfer to the Whitakers a .11 acre parcel of property to the east of the road, but only if a road was built.
The County later determined that it did not have the financial resources to continue with the Arena Project. The County began negotiations for transferring ownership to and completing the project by the City of Batesville. The County, in a letter dated August 3, 1998, requested that the negotiations include a promise by the City to honor the agreement it had entered with the Whitakers concerning the possible construction of a public road.

*15 The County and City signed an agreement on June 16, 1999. The City agreed to complete only Phase I of the Arena Project. The agreement specifically stated that Phase I consisted solely "of the construction of a Stall barn and Multi-Plex Arena." The agreement referred to the plans drawn by the Warrior Group, LTD. The City specifically refused to agree to the construction of any other parts of the project shown on those plans. The City also specifically agreed to "honor the Agreement for Temporary Easement between the County and James S. Whitaker et al [sic] dated July 31, 1996. . . ." A copy of the temporary easement was attached to the agreement.
While the Arena Project was proceeding, a new hospital was constructed on property located west of it. Also proposed was the construction of [a] Wal-Mart SuperCenter between Interstate 55 and the new hospital. For clarity, we note that the Whitaker property was to the east of the Arena Project, while both the hospital and the Wal-Mart store were to the west. All these projects were south of the major west-east road, which was Highway 6.
At a February 18, 2000 meeting of the Board of Alderman for the City, discussion turned to the Arena Project. The minutes note that the "need and placement of roads in the area was also discussed." The minutes note that "Whitaker Road is to be a five lane road." Presumably, this is a reference to the five-lane public road shown on the plans prepared by the Warrior Group, LTD, and the public road that was to be constructed should Phase 2 of the Arena Project commence.
At a May 2, 2000 meeting, the minutes show that the assistant city attorney was authorized by the Board "to draw up appropriate documents to move forward on the agreement between the County and Mr. Whitaker that the City has agreed to honor." A memorandum provided to the Whitakers requested that they sign and have notarized a deed to the City "in fulfillment of [the] agreement with the County." On May 23, 2000, the Whitakers executed a deed donating to the City 4.81 acres of property for the proposed road. The deed did not include specifications for the road such as how many lanes the road might be or when its construction would be completed.
At a September 5, 2000 meeting, the Board decided to delay determining the layout of the roads in the Arena Project area. However, the Board stated that as to the arena, "the main road will be the east most road agreed to in the original agreement between the county and land owners. . . ." The minutes were later amended to specify that the eastern-most road would be the main road if there were two entrances to the property. The Board also authorized a traffic study for the hospital and civic arena area.
At a September 19, 2000 meeting, the minutes show that James "Doc" Whitaker and John Hyneman were present. Mr. Hyneman had donated to the County a portion of his property for construction of the new hospital. Wal-Mart wished to locate its proposed SuperCenter on the remainder of the property owned by Mr. Hyneman near the hospital. The minutes note that both Whitaker and Hyneman "stated their opinions as to the location of the main [road] to this area." The administrator of the hospital also provided the Board with his preference for location of the main entrance to the area from Highway 6. The Board was informed that the existing *16 entrance was "not adequate for the hospital traffic."
At the October 3, 2000 meeting, the Board discussed in executive session "the location of a large retail outlet near the new hospital." When the Board returned to its public meeting, a motion was adopted that the city engineer be ordered to "draw a road design leaving the current entrance off Highway 6 and the frontage road as is and showing construction of an entrance and road at the east side of the city's property with a road `T-ing' off this `new' entrance and road and running westerly to tie into the hospital road network and thereafter to submit this design layout to the business prospect desiring to construct a retail outlet northwesterly of the new hospital for its consideration." This option would provide a road on the Whitaker property.
Two weeks later, on October 17, 2000, the Board again discussed the issue of road design in the area of the Arena Project. The assistant city attorney stated that Wal-Mart did not approve the road design proposed during the last meeting. The Board decided to adopt "the road configuration as proposed by Wal-Mart in the letters of its attorney. . . ." The construction of this road configuration was made contingent upon the following: (1) obtaining title to two parcels of land, (2) the removal of a building through which the road would pass, (3) funding, and (4) "matters involving the bidding and construction process." The minutes of this meeting note that James "Doc" Whitaker and his attorney were present and objected to Wal-Mart's proposal.
The Whitakers appealed this decision by filing a bill of exceptions. The Whitakers argued that the action of the Board in adopting the Wal-Mart proposal was an "arbitrary and capricious decision of the City of Batesville to alter or ignore its often-stated and often-confirmed obligation to build the `main'  or primary  road on the strip of land donated, for that purpose, to the City in May of 2000." The Whitakers alleged that the City's decision devalued their property and adversely impacted negotiations entered into with other parties about the sale or development of their property. The Whitakers also alleged that their constitutional rights had been violated.
The circuit court found that "the decision of the Batesville Board of Alderman changing the route and location of the primary road to serve a newly constructed community hospital and other commercial developments was not arbitrary and capricious and should be affirmed."
Lange, 832 So.2d at (¶¶ 2-15) (footnote omitted).
¶ 3. During their first appeal to this Court, the Whitakers argued that the City breached the contract between them by agreeing to build what would become House-Carlson Road "at the direction of a competing developer and a major retailer." Id. at (¶¶ 13, 17). They requested the City commence building a road consistent with the May 23, 2000 deed or, in the alternative, damages. Id. We held that the issue of breach was not ripe for review, and "until there is a breach, we may not properly determine exactly what obligations the City has as to the specifics of a road." Id. at (¶ 22).
¶ 4. In April 2001, the Whitakers filed suit in the Northern District of Mississippi, but the action was stayed pending this Court's determination of Lange I. Subsequent to Lange I, the City filed a motion for summary judgment. In the interim, the City completed construction of Whitaker Road in January 2004. In April 2005, *17 the district court granted the City's motion based upon the doctrines of collateral estoppel and Rooker-Feldman. Specifically, the district court ruled that the issue of whether the Whitakers were entitled to the "main" road was foreclosed by Lange I. The district court further explained that other issues raised by the Whitakers, one of which was a taking claim, were so intertwined with this Court's decision in Lange I that they were also precluded from federal court consideration by the Rooker-Feldman doctrine. Rooker v. Fidelity Trust Co., 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); District of Columbia Ct. of App. v. Feldman, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983).
¶ 5. On appeal of the district court's ruling, the Fifth Circuit Court of Appeals affirmed the district court's holding based upon collateral estoppel, but vacated the trial court's decision to dismiss a taking claim raised by the Whitakers based upon Rooker-Feldman. Nevertheless, the Fifth Circuit dismissed the claim without prejudice as it determined it was not ripe for review. Following the Fifth Circuit's dismissal, the Whitakers initiated the current cause of action in the Circuit Court of Panola County on January 19, 2006, asserting breach of contract. The City subsequently filed a motion for summary judgment, which was granted by the trial court. The Whitakers now appeal and raise the following issues:
I. WHETHER THE TRIAL COURT ERRED BY FAILING TO CONSIDER PAROL EVIDENCE.
II. WHETHER THE TRIAL COURT ERRED IN HOLDING THAT THE WHITAKERS' BEACH OF CONTRACT CLAIMS WERE BARRED BY THE DOCTRINE OF COLLATERAL ESTOPPEL.
III. WHETHER THE TRIAL COURT ERRED IN DETERMINING THAT THE WHITAKERS WERE NOT ENTITLED TO DAMAGES.

STANDARD OF REVIEW
¶ 6. The standard of review employed by an appellate court on review of disposition of a case on summary judgment is clear.
In reviewing a trial court's grant or denial of summary judgment, our well-established standard of review is de novo. Hubbard v. Wansley, 954 So.2d 951, 956 [(¶ 9)] (Miss.2007). That being said, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Miss. R. Civ. P. 56(c). Additionally, "[t]he evidence must be viewed in the light most favorable to the party against whom the motion has been made." Green v. Allendale Planting Co., 954 So.2d 1032, 1037 [(¶ 8)] (Miss.2007) (quoting Price v. Purdue Pharma Co., 920 So.2d 479, 483 [(¶ 10)] (Miss.2006)). "The moving party has the burden of demonstrating that [no] genuine issue of material fact[s] exists, and the non-moving party must be given the benefit of the doubt concerning the existence of a material fact." Id. (quoting Howard v. City of Biloxi, 943 So.2d 751, 754 [(¶ 4)] (Miss.Ct.App.2006)).
One South, Inc. v. Hollowell, 963 So.2d 1156(¶ 6) (Miss.2007).

ANALYSIS
I. WHETHER THE TRIAL COURT ERRED BY FAILING TO CONSIDER PAROL EVIDENCE.
¶ 7. The trial court opined that parol evidence should not have been considered when determining the meaning of "public *18 road" as used by the parties. Based partly on Martin v. Newell, 198 Miss. 809, 23 So.2d 796 (1945), the court reasoned that because a board of supervisors or aldermen can only act through its minutes, evidence outside its minutes could not be used to determine its obligations. On appeal, the Whitakers argue the trial court erred in ruling as such for three separate reasons. They argue the phrase is ambiguous, that the agreement is incomplete because it does not recite the specifics of the "public road" to be built and, finally, that the parol evidence rule is not applicable to a determination of the true consideration to a contract. We will address each sub-issue separately.
A. Whether the phrase "public road" is ambiguous as used by the parties.
¶ 8. The Whitakers first argue that extrinsic evidence should have been considered by the lower court because the phrase "public road" is ambiguous, requiring examination of evidence outside the purview of the parol evidence rule. In support, Lange cites Kerl v. Smith, 96 Miss. 827, 51 So. 3 (1910), a case in which parol evidence was considered to determine the meaning of the word "timber," and Hattiesburg Plumbing Co. v. Carmichael & Co., 80 Miss. 66, 31 So. 536 (1901), where the supreme court found the term "artesian" ambiguous requiring extrinsic evidence to glean its meaning as used in the contract. As these cases show, it is firmly established that when the language of a contract is ambiguous parol evidence may be admitted to clarify the meaning of the ambiguity. Aron v. Panola-Quitman Grain Corp., 490 So.2d 891, 892-93 (Miss. 1986). However, contracts in which one of the parties is a board of supervisors or other public board are treated differently.
¶ 9. As firmly established as the parol evidence rule is, and its exception for ambiguities, it is also firmly rooted in this state's judicial precedent that "public boards speak only through their minutes and their actions are evidenced solely by entries on their minutes." Thompson v. Jones County Cmty. Hosp., 352 So.2d 795, 796 (Miss.1977); Burdsal v. Marshall County, 937 So.2d 45(¶ 8) (Miss.Ct.App. 2006). One reason for the evidentiary exclusivity of a board's minutes was stated as such:
We also think it was error for the court to permit individual members of the board of supervisors to testify what the board did, and what the board understood, and what the board had authorized to be done in the premises. A board of supervisors can act only as a body, and its act must be evidenced by an entry on its minutes. The minutes of the board of supervisors are the sole and exclusive evidence of what the board did. The individuals composing the board cannot act for the county, nor officially in reference to the county's business, except as authorized by law, and the minutes of the board of supervisors must be the repository and the evidence of their official acts.
Thompson, 352 So.2d at 796 (quoting Smith v. Board of Supervisors, 124 Miss. 36, 41, 86 So. 707, 709 (1920) (emphasis added)).
¶ 10. Additionally, the Thompson court further expounded on the basis for the rule as follows:
When official authority is conferred upon a board or commission consisting of three or more members, the authority so conferred must be exercised by a legal quorum, and, as a general rule, the decisions to be executed or the contracts to be awarded by the board must be determined or decided upon only in or at *19 a lawfully convened session, and the proceedings must be entered upon the minutes, of the board or commission. The reasons for the requirements aforesaid are: (1) That when authority is conferred upon a board, the public is entitled to the judgment of the board after an examination of a proposal and a discussion of it among the members to the end that the result reached will represent the wisdom of the majority rather than the opinion or preference of some individual member; and (2) that the decision or order when made shall not be subject to the uncertainties of the recollection of individual witnesses of what transpired, but that the action taken will be evidenced by a written memorial entered upon the minutes at the time, and to which all the public may have access to see what was actually done.
Thompson, 352 So.2d at 796 (quoting Lee County v. James, 178 Miss. 554, 558-559, 174 So. 76, 77 (1937)) (emphasis added). However, that a board may only speak through its minutes does not equate to the notion that the entirety of a contract must be reproduced within a board's minutes. See Thompson, 352 So.2d at 797. Plans, specifications and other papers specifically referred to by the board in its minutes have been held to constitute a part of the contract. Id. Similarly, the contract "may be enforced if enough of the terms and conditions of the contract are contained in the minutes for [a] determination of the liabilities and obligations of the contracting parties without the necessity of resorting to other evidence." Thompson, 352 So.2d at 797 (emphasis added). However, the individual or group contracting with a board carries the responsibility to ensure the contract is properly recorded. Id.
¶ 11. The Whitakers fail to cite any precedent, and we can similarly find none, for the proposition that the parol evidence rule can be defeated, ambiguity or not, when dealing with a contract of a municipality. That is, that the ambiguity exception to the parol evidence rule trumps the doctrine of exclusivity of a board's minutes. Without such, we hold that application of the parol evidence rule's exception for ambiguity would sit in direct contradiction to the precedent cited supra, and has no application to contracts entered into by a public board. It would allow individuals the ability to state what they believed "the board did, and what the board understood, and what the board had authorized to be done" when the only evidence of what the board did, what the board understood, and what the board had authorized to be done must come from its minutes.
¶ 12. Additionally, any ambiguity in an agreement must be construed against the drafters. AmSouth Bank v. Quimby, 963 So.2d 1145, 1152(¶ 19) (Miss. 2007). "If the minutes do not reflect what is required [by the contract], the private party can insist that a correction be entered." JLG Concrete Prods. Co. v. City of Grenada, 722 So.2d 1283, 1287 (Miss.Ct. App.1998). While the issues of JLG Concrete did not include the interpretation of a possible ambiguity, the statement supra is nonetheless instructive on a private party's responsibility in regard to protecting his or her interests when contracting with a municipality, and, by logical implication, the consequences of failing to ensure that the minutes appropriately reflect what the private party believes is required by the contract. Therefore, if evidence of a board's actions is limited to its minutes any ambiguity in those minutes must be construed against the private party as its shouldered the responsibility to see that the contract was recorded to its specifications. Additionally, any interpretation of an ambiguity must be done without the aid of parol evidence. This issue is without merit.
*20 B. Whether the agreement is incomplete.
¶ 13. The Whitakers next argue that the agreement is incomplete because it does not give specifics of the "public road" that was to be built. In support, they cite to Quick & Grice v. Ashley, 227 Miss. 273, 86 So.2d 40 (1956). In Ashley, Ashley entered into a contract with Quick & Grice to construct a well on Ashley's property. Id., 227 Miss. at 276, 86 So.2d at 41. After two unsuccessful attempts to complete an operable well Ashley brought suit. Id., 227 Miss. at 277-278, 86 So.2d at 41-42. In allowing testimony on the specifications and warranties promised by Quick and Grice, the supreme court stated,
[t]he original order did not state whether it was to be a water well, an oil well, a gas well, or a sulphur well. It called for a rod pump and the appellant used a jet pump. There were also changes between the original order and the finished well as to the type of fixtures which were used in connection with the well.
Id., 227 Miss. at 279, 86 So.2d at 42. As will be explained in issue III, the City was obligated to build a five-lane public road that would serve as the main, east-most road leading to the arena. While the agreement and subsequent discussions by the board of aldermen, as evinced by its minutes, obviously did not go into great detail on the specifics of Whitaker Road, they did describe the road with sufficient detail so as to remove the contract from consideration as incomplete, and with comparison with the contract in Ashley. Therefore, this issue is without merit.
C. Whether parol evidence should have been admitted to clarify the consideration contemplated in the Agreement.
¶ 14. The Whitakers' last argument, that parol evidence should have been allowed, focuses on the consideration involved in the agreement. They argue that because the agreement states "for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration" extrinsic evidence is allowed to show what the true consideration for the agreement was, and cite State Highway Dep't v. Duckworth, 178 Miss. 35, 172 So. 148 (1937) in support. However, this argument is also thwarted by the fact that boards may only speak through their minutes. Id., 178 Miss. at 43, 172 So. at 150.
¶ 15. In Duckworth, Duckworth entered into an agreement with the State Highway Department (SHD) that would allow the SHD to enter the Duckworths' land in order to construct a portion of Highway 49. Id., 178 Miss. at 39, 172 So. at 148. The deed executed between the Duckworths and the state granting the state access to the land stated, in pertinent part, "[f]or and in consideration of Two Hundred Sixty-eight & 25/100 ($268.25) dollars and other valuable consideration." Id., 178 Miss. at 40, 172 So. at 149. However, a subsequent requisition, ordered on the minutes of the board, and auditor's voucher stated the $ 268.25 was "in full settlement of claims and accounts." Id., 178 Miss. at 41, 172 So. at 149. The Duckworths claimed they had an oral agreement with the SHD that approaches would be built and maintained to enable the Duckworths to be able to cross from one side of their land to the other. Id. The trial court subsequently allowed them to present parol evidence that the approaches were the "other valuable consideration" contemplated in the deed's language. Id., 178 Miss. at 39-41, 172 So. at 148-149.
¶ 16. On appeal, the Duckworths supported the trial court's ruling by arguing that, while parol evidence was not admissible to contradict the recitals of a contract, *21 it is admissible to show the true consideration. Id., 178 Miss. at 43, 172 So. at 150. The supreme court reversed the lower court on two separate grounds. Id., 178 Miss. at 43-44, 172 So. at 150. First, the supreme court stated the Duckworths' argument was not applicable to the case as the "full settlement" language included in the voucher and requisition constituted full settlement when the Duckworths accepted payment. Id., 178 Miss. at 43, 172 So. at 150. Second, the court stated:
It is familiar law that boards can only bind the public by contracts entered on their minutes, and that the members, individually, of such a board as the Highway Commission, could not authorize an agent to bind it unless an order therefor was entered upon its minutes authorizing the giving of such authority, or unless the order constituting a contract recited the making thereof, and its approval by the Highway Commission. We think this principle is well established.
It was therefore error to admit oral proof of an agreement antecedent to, or contemporaneous with, the execution of the deed, and there was no authority, under the facts of this record, for the rendition of the judgment . . . against the Highway [Commission][.]
Id. (citations omitted). Therefore, as with evidence explaining ambiguity, evidence outside a board's minutes offered to explain the consideration of an agreement with a public board is not admissible. This issue is without merit.
II. WHETHER THE TRIAL COURT ERRED IN HOLDING THAT THE WHITAKERS' BEACH OF CONTRACT CLAIMS WERE BARRED BY THE DOCTRINE OF COLLATERAL ESTOPPEL.
¶ 17. Under the "FACTS" section of their complaint filed with the Circuit Court of Panola County, the Whitakers alleged that Whitaker Road "differs from what they were originally promised as it is not a main intersection or access to the south of Highway 6, it has no traffic light, and it is not part of the connecting artery joining Highway 35 and Highway 6." The Whitakers claimed they "suffered a serious devaluation of their property as a result of not receiving a road as originally contracted for in a reasonable amount of time." Under the heading "BREACH OF CONTRACT" within their complaint, the Whitakers again stated "the City breached the agreement by failing to perform its promises. Specifically, the City failed to construct Whitaker Road as the main road into the area in question in a timely manner. . . ."
¶ 18. The trial court found that in their first appeal to this Court, the Whitakers "included . . . a breach of contract action seeking money damages claiming that the City's decision devalued their property. . . ." Accordingly, the trial court held "that any argument regarding the building of House-Carlson Road [was a breach of contract], that is that [Whitaker Road] is not the `main' road, is precluded by the doctrine of collateral estoppel," reasoning that the exact issue was addressed in Lange I. As Lange I was at the heart of the trial court's determination of this issue, it is necessary to examine our holding in that case.
¶ 19. At the time, the Whitakers' claim came before this Court for the first time House-Carlson Road had been approved by the Board, if not already built, and Whitaker Road was not yet in existence. The Whitakers filed a bill of exceptions in protest of the Board's decision, claiming it "was an `arbitrary and capricious decision of the City of Batesville to alter or ignore its often-stated and often-confirmed obligation to build the "main"  or primary  *22 road on the strip of land donated . . .,'" but were ultimately unsuccessful. Lange, 832 So.2d at (¶ 14). They appealed this decision to the Circuit Court of Panola County, which found the Board's decision was not arbitrary and capricious. The Whitakers appealed to this Court and included a breach of contract claim despite the fact we were under the same appellate standard of review that constrained the circuit court. Namely,
The standard of review of an order of a Board of Supervisors is the same standard which applies in appeals from the decisions of administrative agencies. Barnes v. Board of Supervisors, 553 So.2d 508, 511 (Miss.1989). "The decision of an administrative agency is not to be disturbed unless the agency order was unsupported by substantial evidence; was arbitrary or capricious; was beyond the agency's scope or powers; or violated the constitutional or statutory rights of the aggrieved party." Board of Law Enforcement Officers Standards & Training v. Butler, 672 So.2d 1196, 1199 (Miss.1996). See also Van Meter v. City of Greenwood, 724 So.2d 925 (Miss. App.1998).
Ladner v. Harrison County Bd. of Supervisors, 793 So.2d 637, 638(¶ 6) (Miss.2001).
¶ 20. In impliedly holding that the Board's decision was not arbitrary and capricious, we explained that the Whitakers' breach of contract claim was premature. We stated, "[t]he Whitakers base their claim for breach of contract upon their belief that Whitaker Road will not or cannot now be built" given the City's decision to build House-Carlson Road. Lange, 832 So.2d at (¶ 20). However, there was no evidence in the record to show that Whitaker Road could not still be built in accordance with the agreement and pertinent minutes of the Board. Essentially, we held that the Whitakers' breach of contract claims were not ripe for review, and "[u]ntil there is a breach, we may not properly determine exactly what obligations the City has as to the specifics of a road." Id. at (¶ 22).
¶ 21. Admittedly, implied in this statement is a holding that the City did not breach the agreement solely by constructing House-Carlson Road. However, that is not to say the Whitakers' claims of breach were barred by collateral estoppel. The doctrine of collateral estoppel was recently discussed by the supreme court. The high court stated:
Under the doctrine of collateral estoppel, "[an] appellant is precluded from relitigating in the present suit specific questions actually litigated and determined by and essential to the judgment in the prior suit, even though a different cause of action is the subject of the present suit." Lyle Cashion Co. v. McKendrick, 227 Miss. 894, 87 So.2d 289, 293 (Miss.1956). Further, "collateral estoppel, unlike the broader question of res judicata, applies only to questions actually litigated in a prior suit, and not to questions which might have been litigated." Dunaway v. W.H. Hopper & Associates, 422 So.2d 749, 751 (Miss. 1982) (quoting Johnson v. Bagby, 252 Miss. 125, 171 So.2d 327 (Miss.1965)).
Mayor & Bd. of Aldermen v. Homebuilders Ass'n of Miss., Inc., 932 So.2d 44, 59(¶ 64) (Miss.2006).
¶ 22. Our holding in Lange I did not stand for the proposition that the City could not breach the agreement at some time in the future. This could occur either by the City failing to build Whitaker Road as per the agreement, or, as identified in Lange I, "by simply never beginning construction." Id. at (¶ 23). At the time the Whitakers filed their most recent complaint with the Circuit Court of Panola County, the issue of whether Whitaker *23 Road, as built, breached the agreement between the City and the Whitakers had yet to be decided. As such, our holding in Lange I did not preclude a future action based upon breach of contract.
¶ 23. With the completion of Whitaker Road in January 2004, the Whitakers were free to bring their most recent action alleging breach of contract. However, given the standard of review we employ upon a review of the trial court's grant of summary judgment, we find that the parameters of Whitaker Road, as built, do not violate the agreement. That is, the City did not breach the agreement, but fulfilled its obligations to the Whitakers in building Whitaker Road. Therefore, while the Whitakers' claim was not barred by the doctrine of collateral estoppel, we nonetheless affirm the trial court's grant of summary judgment as there was no breach of the agreement by the City. See issue III. This issue is without merit.
III. WHETHER THE TRIAL COURT ERRED IN DETERMINING THAT THE WHITAKERS WERE NOT ENTITLED TO DAMAGES.
¶ 24. Finding the issue of whether "public road" was ambiguous to be effectively irrelevant, the trial court continued and held there was no breach of the agreement stemming from the timing of the construction of Whitaker Road. Examining the record before us, we agree. The agreement provided for commencement of the road by 1998, or within two years of the agreement. Additionally, if building of the road was not commenced within two years, the agreement specified that it would be commenced within a reasonable time period. The issue of what is a reasonable time for performance is a question of law. Fortune Furniture Mfg., Inc. v. Pate's Electronic Co., 356 So.2d 1176, 1178 (Miss.1978). Whitaker Road was completed in January 2004, one year prior to the completion of the Civic Center to which it led, and four years after the Whitakers deeded over the property upon which it was built. Given the procedural history and activity of this case, the uncertainty of obligation that would certainly accompany that, and the timing of completion of the road in regard to a completed Civic Center and grant of the land, we find that Whitaker Road was completed within a reasonable time.
¶ 25. Additionally, as identified in issue II, the record also affirmatively shows the City did not otherwise breach the Agreement in building Whitaker Road. The minutes of the Panola County Board of Supervisors from July 31, 1996, stated the relevant portion of the agreement for a temporary easement as such:
The Grantee [County] has plans to build an expo center and is about to embark upon Phase I thereof. If the Grantee commences Phase 2 of such project within two (2) years of the date hereof, then the Grantors [the Whitakers] agree to dedicate to the county such part of the above described 5.47 acres as may be needed for a public road. If Phase 2 is not commenced within two (2) years but the County has evidenced good faith to commence same within a reasonable period of time, then the Grantors agree to extend the aforesaid two (2) year period for a reasonable time.
(emphasis added). The City took over the project and agreed to honor the agreement between the County and the Whitakers, but refused to bind themselves to any other understandings between the County and the Whitakers. Minutes from subsequent meetings of the Board show that it was decided that Whitaker Road was to be a five-lane road and that, in regard to the arena, "the main road will be the east most *24 road agreed to in the original agreement between the county and the land owners."
¶ 26. From the minutes referenced above it is clear that the City agreed to build a five-lane public road that would be the main, east-most road leading to the arena. Public is defined as "[o]f, concerning, or affecting the community or the people[,]" or "[m]aintained for or used by the people or community." The American Heritage College Dictionary, 1106 (3d ed.1993). Whitaker Road satisfies all these requirements. It is a five-lane "public road" that is the main, east-most road leading to the arena. Under the facts before us, we find the City did not breach the agreement.
¶ 27. "When a plaintiff shows breach of the contract, damages may also be shown." Eastline Corp. v. Marion Apartments, Ltd., 524 So.2d 582, 585 (Miss.1988). As the Whitakers have failed to show the City breached the agreement, the issue of damages is moot. Therefore, this issue is without merit.
¶ 28. THE JUDGMENT OF THE CIRCUIT COURT OF PANOLA COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE AND CARLTON, JJ., CONCUR.